**UNITED STATES of America**

v.

**Alan L. KAUFMAN.**

**No. SCr. 91–68.**

United States District Court,
N.D. Indiana,
South Bend Division.

May 28, 1992.

Thomas O. Plouff, Asst. U.S. Atty., South Bend, Ind., for U.S.

Frederick Hains, South Bend, Ind., for Alan L. Kaufman.

## FINDINGS ON SENTENCING

MILLER, District Judge.

Whatever else may be said about the sentencing guidelines' philosophy and substance, the guidelines' procedural provisions create some clumsy and surprising issues. In this case, in which the parties dispute every potentially applicable guideline provision, the government is in the unusual position of trying to prove that a person was not involved in the charged criminal activity.

Alan L. Kaufman was a 49% shareholder in an accounting firm known as Schmanski & Kaufman, P.C., a subchapter S corporation. From 1986 to 1989, Mr. Kaufman diverted client payments to the firm. Because the payments did not reach the firm's bank account, the payments were not included as part of the firm's income on its federal tax return 1120S, and similarly were not reflected on Mr. Kaufman's personal 1040 income tax return. Mr. Kaufman has pleaded guilty to two counts of an eight-count indictment charging him with making false statements on income tax returns. 26 U.S.C. § 7206(1). One count relates to the firm's 1988 return; the other relates to Mr. Kaufman's 1988 return.

Because the offenses occurred after November 1, 1987, the sentencing guidelines promulgated pursuant to the Sentencing Reform Act of 1984, 28 U.S.C. § 994 *et seq.*, apply. *United States v. Parker*, 936 F.2d 950, 955–956 (7th Cir.1991).

As noted above, the parties dispute every potentially applicable determination under the guidelines. A day-long evidentiary hearing was conducted on May 26. Recognizing that the government bears the burden of proof by a preponderance of the evidence on matters that would increase the sentencing range, *United States v. Rossy*, 953 F.2d 321, 325 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 1240, 117 L.Ed.2d 473 (1992), and the defendant bears the burden on matters that would decrease the range, *United States v. Camargo*, 908 F.2d 179, 185 (7th Cir.1990), the court summarizes the disputes as follows:

1. The government computes the "tax loss", for purposes of selecting a base offense level under U.S.S.G. § 2T4.1, at $67,824.00; the presentence report agrees. Mr. Kaufman, disagreeing with the government concerning the application of U.S.S.G. § 1B1.3's "relevant conduct" provisions, computes the tax loss at $38,249.00. The government's figure would produce a base offense level of 11; the defendant's figure would produce a base offense level of 10. The government bears the burden of proof on this issue.

2. The government contends that the unreported income stemmed from criminal activity (embezzlement), which would produce a two-level enhancement of the offense level under U.S.S.G. § 2T1.3(b)(1). Mr. Kaufman contends

that both of the firm's shareholders were involved in the "skimming"; because the shareholders cannot embezzle from themselves, Mr. Kaufman contends that this enhancement is inappropriate. The presentence report agrees with the defendant. The government bears the burden of proof on this issue.

3. The government and the presentence report contend that Mr. Kaufman used sophisticated means to accomplish the crime, requiring a further two-level enhancement under U.S.S.G. § 2T1.3(b)(2). Mr. Kaufman contends that the crime was unsophisticated. The government bears the burden of proof on this issue.

4. The government and the presentence report assert that Mr. Kaufman used a special skill—his training as a Certified Public Accountant—to accomplish the crime, requiring a further two-level enhancement under U.S.S.G. § 3B1.3. The defendant disagrees. The government bears the burden of proof on this issue.

5. Mr. Kaufman claims entitlement to a two-level reduction in offense level for acceptance of responsibility. U.S.S.G. § 3E1.1(a). The presentence report agrees, but the government does not. The government contends that Mr. Kaufman's false statements early in the investigation, his preparations for flight before his arrest, and his continued effort to shift responsibility to the other shareholder combine to preclude a finding of acceptance of responsibility. Mr. Kaufman bears the burden of proof on this issue.

6. Finally, the government and the presentence report contend that one criminal history point should be assessed for a diversionary disposition of a 1990 Illinois criminal charge against Mr. Kaufman, pursuant to U.S.S.G. §§ 4A1.2(a)(1) and 4A1.2(f). Mr. Kaufman disagrees. The government bears the burden of proof on this issue.

If the government prevailed on each issue, the sentencing range would be twenty-four to thirty months; if Mr. Kaufman prevailed on each, the range would be two

to eight months. The court addresses each issue in turn. Additional facts are set forth as necessary. For the reasons that follow, the court concludes that Mr. Kaufman's adjusted level is 13, and that his sentencing range is twelve to eighteen months.

### A. Base Offense Level

After some initial disagreement, the government and Mr. Kaufman now agree that $247,052.00 was diverted from the firm from 1986 to 1989, and that Mr. Kaufman reported $4,820.00 of those funds on his 1989 tax returns because some clients filed form 1099s for funds paid to Mr. Kaufman. The parties disagree as to where these figures lead.

Mr. Kaufman's analysis is drawn from the language of two pertinent guideline sections. U.S.S.G. § 2T1.3 provides the base offense level for violations of 26 U.S.C. § 7206(1). U.S.S.G. § 2T1.3(a)(1) refers the user to the "Level from § 2T4.1 (Tax Table) corresponding to the tax loss, if the offense was committed in order to facilitate evasion of a tax." U.S.S.G. § 2T1.3(a) also provides, "For purposes of this guideline, the 'tax loss' is 28 percent of the amount by which the greater of the gross income and taxable income was understated, plus 100 percent of the total amount of any false credits claimed against tax." No false credits were claimed in this case.

Mr. Kaufman reasons that no tax loss resulted from the false return for the firm. A subchapter S corporation is not taxed like other corporations; the corporation's income flows through to the shareholders, who pay tax on that income as ordinary income, in proportion to their shareholdings. Thus, the pertinent question, as Mr. Kaufman sees it, is the tax loss resulting from his false personal returns in 1986–1989.

As will be discussed more fully below, Mr. Kaufman contends that he did not receive all of the diverted moneys. He contends that the firm's other shareholder, John Schmanski, was involved in the diversion as well, and that he split the diverted

income with Mr. Schmanski. Mr. Kaufman contends that he and Mr. Schmanski split the money evenly in 1986 and 1987, and that in 1988 and 1989, Mr. Kaufman unilaterally increased his cut to an average of 60% because he was doing the bulk of the firm's work.

Accordingly, Mr. Kaufman reasons, the tax loss should be based on the amount of money he received but did not report on his personal income tax return. He begins his calculation with the total amount diverted from the firm, and allocates to himself half of the diverted income from 1986 and 1987 and 60% of the diverted income from 1988 and 1989. From this total, he deducts the diverted moneys reported on his 1989 return, and arrives at a "taxable income" figure of $136,602.00. Applying the 28% figure provided by U.S.S.G. § 2T1.3(a), Mr. Kaufman concludes that the tax loss is $38,249.00:

|  | 1986 | 1987 | 1988 | 1989 | Total |
|---|---|---|---|---|---|
| Diverted Income | 22,584 | 45,512 | 91,613 | 87,343 | 247,052 |
| Kaufman share | 11,292 | 22,756 | 54,968 | 52,406 | 141,422 |
| Already reported | 0 | 0 | 0 | (4,800) | (4800) |
| Taxable income | 11,292 | 22,756 | 54,968 | 47,586 | 136,602 |
| Tax loss (28%) | 3,162 | 6,372 | 15,391 | 13,324 | 38,249 |

Under the tax loss table in U.S.S.G. § 2T4.1, a tax loss of $38,249.00 provides a base offense level of 10.

The government and the presentence report disagree, but on different theories. The government contends that Mr. Schmanski was not involved in the diversion of the funds, and that Mr. Kaufman acted solely for his own benefit; accordingly, the income should not be apportioned in determining the tax loss and the offense level. The issue of Mr. Schmanski's involvement is discussed below, but the court need not resolve that issue for purposes of deciding the tax loss.

The presentence report takes the position that Mr. Schmanski's involvement is irrelevant to determining the tax loss. The guidelines' Application Notes are entitled to substantial deference in interpreting the guidelines. *United States v. McCaleb*, 908 F.2d 176, 179 (7th Cir.1990). Application Note 3 to U.S.S.G. § 2T1.3 provides, "In determining the total tax loss attributable to the offense (*see* § 1B1.3(a)(2)), all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated." The Application Note refers the user to Application Note 3 of U.S.S.G. § 2T1.1, which contains an inexhaustive list of examples, none of which resemble Mr. Kaufman's case.

U.S.S.G. § 1B1.3(a) provides that when any guideline specifies more than one base offense level, the offense level must be determined on the basis of any act in furtherance of the offense, whether committed by the defendant, aided by the defendant, or for which the defendant otherwise would be accountable, U.S.S.G. 1B1.3(a)(1). Further, if the offense is quantity-based, the offense level must reflect all acts that were part of the same course of conduct or common scheme or plan as the offense of conviction. U.S.S.G. § 1B1.3(a)(2). These "relevant conduct" provisions apply to tax offenses. *United States v. Brimberry*, 961 F.2d 1286, 1292 (7th Cir.1992).

■ If, as the government contends, Mr. Schmanski was not involved in the skimming, all proceeds are attributable solely to Mr. Kaufman. If, as Mr. Kaufman testified, he and Mr. Schmanski agreed to skim money from the firm and split it, all skimming was part of the scheme and course of conduct; Mr. Kaufman committed or aided all the skimming. There is no question but

that Mr. Kaufman, who oversaw the firm's internal management and had responsibility for the bookkeeping, was aware of the scope of the conduct, and Mr. Kaufman testified that he assumed Mr. Schmanski was not reporting his share of the split on his income tax returns. *See United States v. Edwards*, 945 F.2d 1387, 1392 (7th Cir. 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1590, 118 L.Ed.2d 308 (1992). Accordingly, U.S.S.G. § 1B1.3(a) requires the court to consider all unreported income, regardless of whose pocket into which it went. Mr. Kaufman has not presented any authority for his implicit proposition, and the court is unpersuaded, that U.S.S.G. § 1B1.3(a) does not require the court to consider, in determining the offense level, moneys the defendant caused to be diverted to another.

Accordingly, regardless of whether Mr. Kaufman received all of the diverted moneys or shared them with Mr. Schmanski, for purposes of U.S.S.G. § 2T1.3(a)(1), the tax loss was $67,831.00:

|  | 1986 | 1987 | 1988 | 1989 | Total |
|---|---|---|---|---|---|
| Diverted Income | 22,584 | 45,512 | 91,613 | 87,343 | 247,052 |
| Already reported | 0 | 0 | 0 | (4,800) | (4800) |
| Taxable income | 22,584 | 45,512 | 91,613 | 82,543 | 242,252 |
| Tax loss (28%) | 6,324 | 12,743 | 25,652 | 23,112 | 67,831 |

The base offense level is 11. U.S.S.G. § 2T4.1

### B. Income from Criminal Activity

U.S.S.G. § 2T1.3(b)(1) provides, "If the defendant failed to report or to correctly identify income exceeding $10,000 in any year from criminal activity, increase [the offense level] by 2 levels." The government contends that the unreported income constituted money embezzled from the firm. Mr. Kaufman contends that both shareholders—he and Mr. Schmanski—were involved in the skimming and, therefore, no embezzlement occurred; he and Mr. Schmanski could not embezzle from themselves. The government contends that Mr. Schmanski was not involved.

The government also argues that even if Mr. Schmanski was involved, he was involved in a 50–50 split; when Mr. Kaufman unilaterally increased his share to 60% (Mr. Kaufman agrees that he did not discuss the matter with Mr. Schmanski), he embezzled from Mr. Schmanski. This argument cannot support an enhancement under § 2T1.3(b)(1), which requires that the unreported income from criminal activity exceed $10,000.00 in any year. If Mr. Kaufman embezzled the "extra" 10% of the unreported income, the embezzled portion of the unreported income did not exceed $10,000.00 in any year. The unreported amounts in 1988 and 1989 were $91,613.00 and $82,543.00 respectively; the embezzled 10% would amount to $9,161.00 and $8,254.00.

Accordingly, the court must decide whether Mr. Schmanski was involved. More accurately, because an enhancement of the offense level is at issue, the court must decide whether the government has shown, by a preponderance of the evidence, that Mr. Schmanski was not involved.

Several facts established at the sentencing hearing support the government's position. First, Mr. Kaufman made no mention of Mr. Schmanski's alleged involvement until his March 8, 1991 interview with IRS agents, after several prior interviews had produced no suggestion of Mr. Schmanski's involvement. Second, around April 1991, Mr. Kaufman agreed to wear a body microphone and speak with Mr. Schmanski about the agreement to skim and split the firm's income; in the monitored conversation, Mr. Schmanski denied any involvement. Third, the IRS's investigation uncovered no one

who claimed to have personal knowledge of Mr. Schmanski's involvement; those who claimed to know based their knowledge on rumor and hearsay.

The fourth and fifth points in support of Mr. Schmanski's non-involvement coincide. Kathy Wagner worked for the accounting firm and made the bookkeeping entries, discussed below, that allowed Mr. Kaufman's scheme to operate. She testified that Mr. Schmanski became aware of Mr. Kaufman's skimming and asked her to show him the firm records that would prove it. He asked her which clients were writing the checks that were going to Mr. Kaufman, and whether those checks were going into the firm's bank account. Mr. Schmanski then asked Ms. Wagner to prepare a summary of the money Mr. Kaufman was taking.

On November 1, 1989, Mr. Schmanski and Mr. Kaufman terminated their relationship pursuant to a written agreement. Mr. Kaufman's employment was terminated immediately, and a non-compete clause was imposed on Mr. Kaufman. In paragraph 6 of the agreement, the firm and Mr. Schmanski released Mr. Kaufman from any claim for payment or reimbursement of monies Mr. Kaufman owed to Mr. Schmanski or the firm, but provided that the release would be void if Mr. Kaufman violated the separation agreement or took any future action indebting him to Mr. Schmanski or the firm, in which event the firm and Mr. Schmanski "shall be free to pursue any and all claims of any nature, civil and/or criminal, against" Mr. Kaufman. The agreement prohibited Mr. Schmanski from discharging that obligation in bankruptcy.

Under the separation agreement, Mr. Kaufman received the rights to certain firm clients, was to be carried on the firm's group health insurance policy at his own expense until he obtained other insurance, and was released from specified financial obligations of the firm. The agreement provided Mr. Kaufman with nothing resembling the rights given the firm and Mr. Schmanski in paragraph 6.

Mr. Kaufman provided explanation for most of those points and offered additional evidence of Mr. Schmanski's involvement. As to his failure to mention Mr. Schmanski in his earlier interviews, Mr. Kaufman explains that he wanted to give Mr. Schmanski an opportunity to turn himself in. Mr. Kaufman explains that Mr. Schmanski seemed simply to want to terminate the monitored conversation, which occurred when Mr. Kaufman appeared unannounced at the end of the day; the relationship between the former partners already was strained. Mr. Kaufman explains the separation agreement simply on the ground that Mr. Schmanski was the majority shareholder and was entitled to fire Mr. Kaufman on whatever terms he wished. He notes as well that Mr. Schmanski has not initiated any civil or criminal proceedings under paragraph 6 of the separation agreement.

Mr. Kaufman himself testified that Mr. Schmanski was involved and, indeed, specifically had approved the idea of skimming. He also presented the testimony of other former firm employees. Rose Caparell testified that it was common knowledge at the firm that Mr. Kaufman and Mr. Schmanski were skimming and splitting the money. She would see cash on Mr. Schmanski's desk the day after Mr. Kaufman would take checks to cash. She testified to having heard that another firm employee, John Fredlake approached Mr. Schmanski in the parking lot with the suggestion that if the owners would skim less cash, there would be more money for raises, and that Mr. Schmanski responded that "it wasn't all that much, maybe $5,000 to $6,000." A similar comment was made at a staff meeting in 1987 or 1988, and, as Ms. Caparell recalled, Mr. Schmanski "just broke down and cried".

Nancy Rosetto testified that she would meet with Mr. Kaufman and Mr. Schmanski twice monthly, and they would give her instructions as to names to be written off when clients paid in cash; it was her understanding that the principals would have split that cash. She testified that she told them on many occasions that if they ever got caught at what they were doing, they would be in hot water; both laughed. Ms.

Rosetto testified that at times she would take client checks, made out to Mr. Kaufman, to the bank to cash and put the proceeds on Mr. Schmanski's desk. Ms. Rosetto agreed that the "skim and split" conduct was generally known among the firm employees. She, too, recounted the accusation in the staff meeting, but was unsure of Mr. Schmanski's response: she testified that he might have gotten mad and yelled back, but "it was kind of laughed off." She conceded that while she heard Mr. Kaufman and Mr. Schmanski talk about how much money they would get from the firm, neither directly told her that they were taking money from the firm.

All of the witnesses attested to Mr. Schmanski's serious drinking problem, but none believed that his illness prevented him from understanding what was going on at the firm.

As stated above, the government bears the burden of establishing, by a preponderance of the evidence, that Mr. Schmanski was not involved in the diversion of funds. Proving a negative can be an onerous burden, but the court believes the government has met that burden in this case. Mr. Kaufman's credibility did not impress the court. Apart from his testimony, his evidence consisted largely of persons drawing conclusions based in part on rumor and hearsay. Much of the government's evidence is no stronger; for example, the court is little persuaded by Mr. Kaufman's inability to wrest an admission from Mr. Schmanski during the monitored conversation.

The court finds the separation agreement persuasive. Paragraph 6 constitutes a strong reservation to Mr. Schmanski to sue Mr. Kaufman in the event of a breach of the agreement. Mr. Kaufman suggests that the clause relates to the "extra" 10% Mr. Kaufman arrogated to himself in 1988 and 1989, but the court finds it most doubtful that Mr. Schmanski intended to reserve the right to sue for breach of an agreement to split unreported income. In light of the record before the court, the most likely explanation of paragraph 6 is that suggested by Ms. Wagner's testimony: Mr.

Schmanski discovered that Mr. Kaufman was diverting funds from the firm and fired him for it. Mr. Kaufman notes that Mr. Schmanski has instituted no civil or criminal action pursuant to paragraph 6, but Mr. Kaufman's breach of the separation agreement is a predicate to such action, and the record contains no indication that Mr. Kaufman has breached the separation agreement.

Mr. Schmanski was not involved in diverting the firm's funds or in receiving the diverted funds. Mr. Kaufman was embezzling from Mr. Schmanski and the firm. Because Mr. Kaufman failed to report income exceeding $10,000.00 from that embezzlement in several years, his offense level is increased two levels, to level 13.

### C. Sophisticated Means; Special Skill

The government argues for the application of two additional two-level enhancements pursuant to U.S.S.G. §§ 2T1.3(b)(2) and 3B1.3. Because of the factual and analytical overlap between these two enhancements, the court addresses them together.

U.S.S.G. § 2T1.3(b)(2) provides, "If sophisticated means were used to impede discovery of the nature or extent of the offense, increase [the offense level] by 2 levels." Application Note 2 explains that, " 'Sophisticated means' ... includes conduct that is more complex or demonstrates greater intricacy or planning than a routine tax-evasion case. An enhancement would be applied, for example, where the defendant used offshore bank accounts or transactions through corporate shells."

U.S.S.G. § 3B1.3 provides, "If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic." Application Note 2 to this section explains, " 'Special skill' refers to a skill not possessed by members of the general public and usually requiring substantial education, training or

licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts." The Background to the section explains that the enhancement is aimed at persons who abuse their special skills to facilitate significantly a crime's commission or concealment; such people generally are viewed as more culpable.

Mr. Kaufman cashed checks that clients made out to him personally. Mr. Kaufman instructed some of those clients to make their checks payable to him personally. Those funds never made it into the firm's bank account. The firm used a "pegboard" or "one-write" bookkeeping system, under which a bank deposit is recorded one time, producing entries in both a disbursements/income journal and in accounts receivable records. Thus, if a firm client paid its bill with a check for $500.00, that payment would be reflected both as firm income in the disbursements journal and as a credit in the client's account receivable record.

The diversion's success depended upon clients not being billed a second time for services for which they already had paid Mr. Kaufman. To prevent second billings, Mr. Kaufman used two approaches.

The first approach used the Post–It note. Mr. Kaufman would attach a Post–It note to client invoices, telling the client to make the check payable to him. He would then instruct the firm's bookkeepers to show that client's debt as a "write off", not to be collected. Accordingly, the client would not be billed again, and the firm's records would not show the payment.

At a later time, Mr. Kaufman began to use a system of "dummy" deposit slips. A false deposit slip would be prepared, showing that the payment had been deposited in the firm's bank account, but the "deposit" would be reflected in the records only in the accounts receivable books. The records would show that the client had paid, but would not reflect deposit of the payment.

Under either system, the paper trail remained: no true deposit record would exist for payments Mr. Kaufman pocketed.

Thus, when Ms. Wagner was told to put together proof for Mr. Schmanski, she could do it; when IRS Agent Lorna Eagle reviewed the firm's records, she, too, could assemble the figures. Both systems, however, kept clients from letting the cat out of the bag upon receiving a duplicate billing.

Mr. Kaufman also did much of the legwork involved in the scheme himself. He would open the mail on most occasions and would cash the checks.

### 1. § 2T1.3(b)(2)

The court does not agree that these devices constitute sophisticated means within the meaning of U.S.S.G. § 2T1.3(b)(2). Finding checks in the mail and cashing them is not particularly sophisticated. The government is nearly correct in its description of the dummy deposit ticket system as keeping a second set of books, but neither system seems to be marked by the sort of sophistication that distinguishes the examples given in the commentary to U.S.S.G. § 2T1.3. There were no off-shore banks, no dummy corporations. Although Mr. Kaufman employed methods to evade detection by clients, the court cannot say that his scheme was more complex or demonstrated greater intricacy or planning than a routine tax evasion case.

The government attempts to bolster its argument for "sophisticated means" enhancement by noting that Mr. Kaufman embezzled money repeatedly over a four year period and repeatedly failed to report the income. The government is factually correct, but the court does not believe repetitive conduct demonstrates "sophisticated means". Repetitive, extended conduct may support a finding of "more than minimal planning" under guidelines provisions applicable to other crimes, *see, e.g.,* U.S.S.G. § 2F1.1(b)(2)(A); *United States v. DeFelippis*, 950 F.2d 444, 446 (7th Cir. 1991), and an earlier version of the guidelines referred the reader of U.S.S.G. § 2T1.3(b)(2) to such provisions, *see United States v. Brinson*, No. 90 Cr 253–1, 2, 1991 WESTLAW 235925 at *2 (N.D.Ill.1991), but the current version of the guidelines contains no such reference. Unless the

amendment produces a harsher sentence, the court is to apply the guidelines in effect at the time of sentencing. *See United States v. Bader*, 956 F.2d 708, 709 (7th Cir.1992); *United States v. Bradach*, 949 F.2d 1461, 1465 n. 5 (7th Cir.1991).

### 2. § 3B1.3

■ Although the "write off" and "dummy deposit ticket" methods of evading detection were not sophisticated within the meanings of the guidelines, however, Mr. Kaufman's special skill and training as a CPA significantly facilitated their use. U.S.S.G. § 3B1.3 "was intended to punish those who abuse their special skills by using them to facilitate criminal activity rather than legal, socially beneficial activity." *United States v. Young*, 932 F.2d 1510, 1514 (D.C.Cir.1991). The court does not find, as was found in *United States v. Mettler*, 938 F.2d 764, 767 (7th Cir.1991), and *United States v. Hubbard*, 929 F.2d 307, 310 (7th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 206, 116 L.Ed.2d 165 (1991), that Mr. Kaufman's accounting skill was essential to the scheme; evidence introduced at trial indicated that the "pegboard" bookkeeping system is a fairly simple one, and even a non-accountant eventually would be able to devise the systems Mr. Kaufman employed.

Unlike the non-accountant, however, Mr. Kaufman brought knowledge of the bookkeeping system to the scheme, and was able to use that knowledge to devise methods of avoiding detection. U.S.S.G. § 3B1.3 does not require that the special skill be essential to the crime; it requires that the special skill significantly facilitate the criminal activity. "Facilitate" means "to make easier". *United States v. Young*, 932 F.2d at 1513. Mr. Kaufman's skill, not possessed by members of the general public, enabled him to circumvent the bookkeeping system, from the outset, in such a way as to evade detection through client complaints of double billing.

As Mr. Kaufman notes, he is not charged with embezzlement, and the special skill must facilitate significantly the charged crime. *See United States v. Foster*, 876 F.2d 377 (5th Cir.1989). Nonetheless, the special skill allowed Mr. Kaufman to take firm funds without a record of the firm's receipt of the funds, thus keeping the diverted funds from being reported on the firm's tax return, on the K–1 form that reflects income to shareholders, or on his personal income tax return.

### 3. Enhancement

Sophisticated means were not used to commit the offense, but Mr. Kaufman used a special skill to facilitate significantly the offenses of conviction. The offense level is enhanced two levels to 15.

### D. *Acceptance of Responsibility*

■ U.S.S.G. § 3E1.1(a) provides for a two-level reduction in offense level for a defendant who clearly accepts personal responsibility for the offense of conviction. A defendant may receive consideration for this reduction without regard to whether the conviction arose from a guilty plea or a jury verdict, U.S.S.G. § 3E1.1(b), but a guilty plea does not entitle a defendant to this reduction as a matter of right. U.S.S.G. § 3E1.1(c). Sentencing courts in this circuit are to examine the non-exclusive list of considerations set forth in the application notes to U.S.S.G. § 3E1.1 when assessing a claim of acceptance of responsibility, *United States v. Beal*, 960 F.2d 629, 631 (7th Cir.1992); *United States v. Sullivan*, 916 F.2d 417, 420–421 (7th Cir.1990), although a single factor may outweigh all the others. *United States v. Corn*, 956 F.2d 135, 137 (7th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 1574, 118 L.Ed.2d 218 (1992). Those considerations are as follows:

■ *a. Voluntary termination or withdrawal from criminal conduct or associations.* Mr. Kaufman withdrew from the firm in November 1989, and he has been in custody since December 1991. The record indicates that Mr. Kaufman did not entirely avoid criminal activity during the interim. He sought to enlist Lynette Darmer's aid in obtaining false identification, and he provided false identification to another person. At the time of his arrest, he had a false birth certificate, a false car

title, and a fictitious physician's billing for treatment of a non-existent child.

*b.  Voluntary payment of restitution prior to adjudication of guilt.*  Mr. Kaufman offered to make restitution to the IRS in May 1991, but the IRS did not respond to his offer.  He now lacks the ability to make restitution in the near future.

*c.  Voluntary and truthful admission to authorities of involvement in the offense and related conduct.*  Mr. Kaufman began cooperating with the IRS early in the investigation.  On several occasions, however, he was untruthful or less than fully forthcoming with the authorities.  In the initial interview on February 1, 1991, Mr. Kaufman denied all wrongdoing and stated that all the information on his 1986–1989 tax returns was correct.  He stated that all client payments went into the firm bank account.  Four days later, he told the IRS agents that in 1988 and 1989, he had borrowed approximately $100,000.00 from the firm, and that he had kept accurate records of the loans.  He then explained the diversion of checks made payable to him, and conceded there was no note reflecting the loans.  He did not volunteer information about his activities in 1986 and 1987.

The government also notes Mr. Kaufman's insistence, which has been consistent at least since Mr. Kaufman first made the accusation, that Mr. Schmanski was involved in the scheme.  Finally, the government notes Mr. Kaufman's stated plans to flee to Canada, apparently under a false identity, after the investigation and his cooperation began, but before the indictment was returned.

In an earlier portion of this memorandum, the court detailed its reasons for disbelieving Mr. Kaufman's assertion that Mr. Schmanski was involved in skimming the firm's funds.  False testimony weighs against a finding of acceptance of responsibility, *United States v. Cooper,* 942 F.2d 1200, 1208 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1303, 117 L.Ed.2d 524 (1992), as does a defendant's failure to give a full, accurate account of the charged crime, *see United States v. Trussel,* 961

F.2d 685, 691 (7th Cir.1992); *United States v. McGuire,* 957 F.2d 310, 317 (7th Cir. 1992), but recognizing that this finding already produced a two-level enhancement, the court hesitates to give too much weight to these considerations.  Mr. Kaufman's rationalization that the scheme was Mr. Schmanski's idea, however, is entitled to additional weight against reduction in the offense level.  *United States v. Beal,* 960 F.2d 629, 631 (7th Cir.1992).

The court also hesitates to give great weight to Mr. Kaufman's less than candid early discussions with the IRS.  In other guidelines settings, the courts have demonstrated reluctance to place great weight on pre-indictment denials of guilt.  *See, e.g., United States v. Fiala,* 929 F.2d 285, 290 (7th Cir.1991) (addressing enhancement for obstruction of justice under U.S.S.G. § 3C1.1).

*d.  Voluntary surrender to authorities promptly after commission of the offense.*  Mr. Kaufman did not surrender, and was given no opportunity to do so.  He voluntarily maintained contact with authorities during the investigation.  It appears that, as indictment neared, he was preparing to flee to Canada rather than face imprisonment.  At the time of his arrest, however, he was registered under his own name at a South Bend hotel.

*e.  Voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense.*  Mr. Kaufman has cooperated with the government in discerning the amount of diverted income.  He disclosed his methods of cooking the firm's books.

*f.  Voluntary resignation from the office or position held during the commission of the offense.*  Mr. Kaufman left the firm and has tried to surrender his license as a CPA in Indiana (although there appears to be no agency to which to surrender such a license).  He has not resigned his right to practice accounting in certain other states, but those rights will expire soon, and he has taken no steps to renew those rights.

*g.  The timeliness of the defendant's conduct in manifesting the acceptance of*

*responsibility.* Mr. Kaufman began his cooperation, albeit somewhat haltingly, shortly after the initial contact by the IRS. Well before the indictment, he inquired into the IRS's pre-indictment guilty plea procedure and offered to make restitution. He made his first court appearance on December 13 and pleaded guilty on February 4.

Whether Mr. Kaufman has accepted responsibility within the meaning of U.S.S.G. § 3E1.1(a) is a close question. On balance, the court believes Mr. Kaufman has met his burden under that section. He cooperated with the government well before his indictment, and did so in a primarily (although not entirely) truthful manner. Although he made preparations for flight, he did not flee. He has tried to surrender his Indiana CPA license, and he pleaded guilty promptly. The government is correct that he has been less than wholly truthful, and he lied about Mr. Schmanski's involvement at the sentencing hearing. The court cannot, however, shade the reduction for acceptance of responsibility; a defendant either receives a two-level reduction or he does not. *United States v. Donatiu,* 720 F.Supp. 619, 622–623 (N.D.Ill.1989). On balance, Mr. Kaufman is entitled to the two-level reduction.

The final adjusted offense level is 13.

### E. Criminal History Points

■ The final issue relates to the presentence report's proposed assessment of a single criminal history point for a 1990 episode. Resolution of the issue will not affect the sentencing range; Mr. Kaufman will be in criminal history category I regardless of the outcome of this issue. At this stage of the proceedings, however, the court cannot determine whether the presence or absence of a criminal record will play a part in the court's selection of a sentence within the applicable range. Accordingly, the court must resolve the issue. Fed.R.Crim.P. 32(c)(3)(D).

The government presented no evidence on this issue at the sentencing hearing. Mr. Kaufman testified to his earlier court proceeding, but the court was not impressed by Mr. Kaufman's understanding of the procedures involved. Accordingly, the court relies on the presentence report for its factual findings. The court finds the presentence report reliable in light of its reference to the content of the Illinois court records.

In 1990, while Mr. Kaufman was living in Illinois, Carolyn Uhler (the person with whom Mr. Kaufman had been living) accused Mr. Kaufman of pushing her into some bushes and striking her with his hand. A criminal complaint for battery was filed against Mr. Kaufman. On September 26, 1990, Mr. Kaufman entered a formal plea of guilty to the charge and was sentenced to one year's court supervision, with the proviso that judgment of conviction would be withheld if Mr. Kaufman successfully completed the year of supervision. Mr. Kaufman received a satisfactory discharge from supervision on September 25, 1991.

U.S.S.G. § 4A1.1(c) requires the assessment of one criminal history point for each "prior sentence" that did not include imprisonment for sixty days or more. U.S.S.G. § 4A1.2(a)(1) defines "prior sentence" as any sentence previously imposed upon adjudication of guilt, whether by plea or trial, for conduct not part of the offense of conviction. U.S.S.G. § 4A1.2(f) provides that diversion without a finding of guilt is not counted, but a diversion from an adult court resulting from an admission of guilt is a prior sentence even if no conviction is formally entered.

Mr. Kaufman admitted his guilt by pleading guilty. Under U.S.S.G. § 4A1.2(f), the resultant diversion is to be counted as a "prior sentence" for which one criminal history point is to be assessed under U.S.S.G. § 4A1.1(c).

Mr. Kaufman has one criminal history point, placing him in criminal history category I.

### F. Sentencing Range

An offender at offense level 13 and in criminal history category I faces a sentencing range of twelve to eighteen months imprisonment. U.S.S.G. § 5A. Probation

is not authorized. U.S.S.G. § 5C1.1(f). The record discloses no basis for departure from the applicable range. The court will reconvene the sentencing hearing as soon as possible to select a sentence within the range.