UNITED STATES of America

v.

Ephraim LEWIS, Defendant.

No. 95 CR 300 (SAS).

United States District Court, S.D. New York.

Oct. 16, 1995.

Robert G. Morvillo, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York City, for defendant Ephraim Lewis.

## OPINION

SCHEINDLIN, District Judge.

Defendant Ephraim Lewis has pled guilty to tax evasion and to conspiracy to defraud the IRS and to evade taxes. In its Presentence Report, the Probation Department has recommended that the Court increase the defendant's offense level by two points for the use of sophisticated means pursuant to U.S.S.G. § 2T1.1(b)(2).[1] The defendant opposes this recommendation. The Government has the burden of establishing, by a preponderance of the evidence, that the recommended sentencing enhancement applies.

### I. *Factual Background*

From 1984 through 1992, the defendant participated in a tax evasion scheme created by his accounting firm. During those years, Mr. Lewis inflated his itemized deductions, thereby evading the full amount of taxes he owed. In order to achieve this goal, the accounting firm sent Mr. Lewis schedules listing amounts and fictitious payees for checks that he was to prepare. Mr. Lewis then drew checks payable to fictitious payees as indicated on the accountants' schedules. The accounting firm then deposited these checks in the twenty-six accounts it had created in the names of these fictitious payees. The accounting firm then transferred the funds to other bank accounts, taking 10% for itself and using the remainder to pay expenses, such as credit card bills, as directed by the defendant.

By the time the scheme was uncovered, Mr. Lewis had written approximately 178 checks totalling $154,839.07. He then used the majority of these checks to claim fraudulent deductions.[2] For example, Mr. Lewis

Mary Jo White, United States Attorney, Southern District of New York by Lewis J. Liman, Peter K. Vigeland, Assistant United States Attorneys, New York City, for United States of America.

---

1. Citations to the Sentencing Guidelines are to those in effect as of November 1, 1992 as the parties have stipulated that the 1992 Sentencing Guidelines apply.

2. The Government contends that Lewis used 88% of the total amount of checks written to the fictitious accounts to inflate his deductions. *See* Government Memorandum ("Gov't Mem.") at 4.

Defendant contends, however, that there is little or no "matching" between the fictitious checks and the false deductions. *See generally* Defendant's Reply Memorandum ("Reply Mem.") at 5. Defendant points out that since the checks did not match the deductions, producing the checks would not have misled an auditor seeking support for the claimed deductions.

took a deduction of $2,895 on a schedule attached to his 1988 return for "commissions"; these commissions correlate to the checks that he prepared in 1988 payable to two fictitious payees. The scheme resulted in a total tax loss of approximately $40,000.

## II. The Sophisticated Means Enhancement

Part T of the Sentencing Guidelines is the section addressing offenses involving taxation. The first subpart, § 2T1.1, addresses the crime of tax evasion. The base offense level is determined by the amount of the tax loss. Next, two specific offense characteristics are defined. The second, § 2T1.1(b)(2), states that "[i]f sophisticated means were used to impede discovery of the nature or extent of the offense, increase by 2 levels." Application Note 6 states that:

> 'Sophisticated means,' as used in § 2T1.1(b)(2), includes conduct that is more complex or demonstrates greater intricacy or planning than a routine tax-evasion case. An enhancement would be applied for example, where the defendant used offshore bank accounts, or transactions through corporate shells.

The "Background" section of the Commentary explains that "[a]lthough tax evasion always involves some planning, unusually sophisticated efforts to conceal the evasion decrease the likelihood of detection and therefore warrant an additional sanction for deterrence purposes." If the Court determines that "sophisticated means" were used, the base offense level must be increased.

█ In determining specific offense characteristics, a court must consider relevant conduct, as determined on the basis of certain factors set forth at U.S.S.G. § 1B1.3. The Guidelines require a court to consider

> all reasonably foreseeable acts and omissions of others in furtherance of ... jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

U.S.S.G. § 1B1.3(a)(1)(B). Application Note 2 defines a "jointly undertaken criminal activity" as "a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy." There is no question here that defendant's acts were taken in concert with the acts of the accounting firm. Thus, the defendant is responsible for all of the acts taken by the accounting firm in furtherance of their jointly undertaken criminal activity and all of the acts that were reasonably foreseeable in connection with that criminal activity.[3]

## III. Discussion

█ It is not easy to define the term "sophisticated means." Indeed, what one court views as sophisticated means may not be so viewed by another court. To some degree, then, the determination is subjective. As succinctly stated by one court, "whether the scheme was "sophisticated" or not is essentially a question of fact." United States v. Hunt, 25 F.3d 1092, 1097 (D.C.Cir.1994).

The offense of tax evasion falls along a continuum of increasing sophistication as follows: failing to report cash income; creating and utilizing double books; inflating deductions; using numbered or offshore accounts that protect the identity of the account's owners; creating fraudulent tax shelters; es-

---

**3.** This Section does not require that Lewis be held accountable for the overall tax evasion scheme perpetrated by the accounting firm. At oral argument, the Government described the scope of the full scheme to defraud. The accounting firm utilized over 150 fictitious accounts on behalf of many clients. See Transcript ("Tr") October 3, 1995 at 24. The Government further noted that this scheme has been in existence for more than thirty years. Id. at 30. Finally, when tax audits were conducted, the accounting firm produced both the escrow checks and phony invoices to support these checks. Id. Similarly, in the Presentence Report ("PSR"), the Probation Department describes conduct which does not relate to Lewis. (See, e.g., Unreported Skimming of Corporate Funds on Personal Returns (PSR at 7) and Payments Off the Books (PSR at 8)). Nonetheless, as is patently clear from the amount of loss attributed to Lewis ($40,000) by the Probation Department ($40,000 PSR at 13), he cannot be held accountable, nor judged, on the basis of the full breadth of misconduct perpetrated by the accounting firm.

tablishing, maintaining and using shell corporations to make it difficult or impossible to trace the flow of money; engaging in complex commercial schemes including "land flips;" and creating phony foreign tax credits. Many other types of fraudulent schemes to evade taxes could surely be added to this list; the types of fraudulent conduct are as unlimited as the creativity of the criminal mind.

In any event, the question facing this Court is where to draw the line between a scheme that uses "sophisticated means" and one that does not. The analysis begins with the language of the Guidelines, continues with a review of cases interpreting that language and concludes with the application of the statute and caselaw to the facts of this case.

The examples of "sophisticated means" provided in the Application Notes are only examples, yet they are instructive in discerning the intent of the Commission. The use of offshore bank accounts implies that the perpetrator has used a means that will protect his or her identity. Similarly, "transactions through corporate shells" implies conducting business through corporate entities designed to shield the identity of the ultimate controlling person(s) or decision maker(s). In both instances, the examples describe "means" that are "sophisticated" at protecting against the discovery of the scheme or the identification of the person responsible for or benefitting from the fraudulent scheme.

### A. *Finding of No Sophisticated Means*

A review of the cases interpreting this section reveals a similar distinction. In *United States v. Rice,* 52 F.3d 843 (10th Cir.1995), the defendant, a certified public accountant, falsely claimed that more money had been withheld by his company than he owed in taxes, thereby causing him to receive a tax refund to which he was not entitled. The court held that

> In substance, Mr. Rice's fraud is the functional equivalent of claiming more in itemized deductions than actually paid. If that scheme is sophisticated within the meaning of the guideline, then every fraudulent tax

return will fall within that enhancement's rubric.

*Id.* at 849. Because there was nothing about this scheme that prevented the identification of the criminal or the discovery of the fraud, the court found that sophisticated means had not been used.

In *United States v. Kaufman,* 800 F.Supp. 648 (N.D.Ind.1992), the court refused to apply the two-point enhancement. Kaufman, an accountant, failed to report income from clients that were diverted from Kaufman's accounting firm to him. Kaufman either (i) instructed the client to pay him personally and directed the bookkeeper to show the debt as a write-off or (ii) created a phony deposit slips showing that the payment was deposited in the firm account when it was not. The deposit was then recorded in the accounts receivable journal which indicated payment of the claim without specifying the amount paid. While the scheme may have been somewhat complicated, the court found that defendant did not use sophisticated means to protect him from being identified as the perpetrator or from permitting a reasonably competent auditor to discover the fraud by reviewing the company's books. The court held that

> [t]here were no off-shore banks [and] no dummy corporations. Although Mr. Kaufman employed methods to evade detection by clients, the court cannot say his scheme was more complex or demonstrated greater intricacy or planning than a routine tax evasion case.

*Id.* at 655. The court made two further observations, both relevant to the case at hand. In addressing the issue of difficulty of detection, the court noted that under either of the two methods of hiding the failure to credit the payments to the firm, "the paper trial remained: no true deposit record would exist for payments Mr. Kaufman pocketed." *Id.* Finally, the Government argued that the scheme was sophisticated because the defendant embezzled the money repeatedly over a four year period and repeatedly failed to report the income. In rejecting the argument, the court stated that it "does not be-

lieve repetitive conduct demonstrates 'sophisticated means'." *Id.*[4]

### B. *Finding of Sophisticated Means*

In other cases, however, courts have applied or approved of the two-point enhancement for sophisticated means. *See, e.g., United States v. Veksler,* 62 F.3d 544 (3d Cir.1995) (defendant used a "daisy chain"—a series of paper transactions through numerous companies, some of which were largely fictitious—to conceal taxable sale of diesel fuel oil); *United States v. Hunt,* 25 F.3d 1092, 1097 (D.C.Cir.1994) (defendant devised "tax-favored" investments that were so sophisticated that "to this day neither the probation officer nor the government ... can figure out exactly what he did"); *United States v. Pierce,* 17 F.3d 146 (6th Cir.1994) (taxpayer exempted himself from withholding by providing false information to employer; failed to file tax returns; used several mailing addresses to impede discovery by the IRS; and directed his wife to file misleading returns); *United States v. Hammes,* 3 F.3d 1081, 1083 (7th Cir.1993) (bookie concealed gambling income from computerized clearinghouse by using aliases and bettor code numbers, repeatedly moving his wire room, destroying records, and establishing offshore accounts); *United States v. Charroux,* 3 F.3d 827, 836–37 (5th Cir.1993) (defendants structured elaborate transactions to hide their revenues from complicated land flips); *United States v. Ford,* 989 F.2d 347, 348 (9th Cir.1993) (defendant set up Canadian corporations to generate fraudulent foreign tax payments which he then claimed on his domestic income tax return); *United States v. Jagim,* 978 F.2d 1032, 1041–42 (8th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2447, 124 L.Ed.2d 664 (1993) (defendants "extensively planned and executed" cattle breeding

tax shelter scheme and lured potential participants); *United States v. Becker,* 965 F.2d 383, 390 (7th Cir.1992) (doctor eliminated all bank accounts in his name and deposited income in a numbered account at a warehouse bank), *cert. denied,* —— U.S. ——, 113 S.Ct. 1411, 122 L.Ed.2d 783 (1993).[5] In all of these cases, the hallmark of the "sophisticated means" was the protection of the identity of the perpetrator and/or the existence of the fraudulent scheme.

Two of these cases are particularly relevant to the issue before this Court. In *Veksler,* the daisy-chain case, the court found that defendants' use of corporate shells was similar to that described in the Commentary to § 2T1.1(b)(2). A brief quotation provides the flavor:

> In each 'daisy chain,' the change in characterization of number two oil from tax-free home heating oil to taxable diesel fuel was effected through the use of a 'burn company,' which would purchase number two oil as tax-free home heating oil and then sell it to another company as diesel fuel. The burn company, which typically held an IRS Form 637, would produce invoices to its purchaser reflecting that the diesel fuel taxes had been paid and that the taxes were included in the price. *Although the burn company was liable for the payment of taxes on the oil, it paid no taxes and typically existed for a brief time and then disappeared.*

*Id.,* 62 F.3d at 547 (emphasis added). In *Jagim,* the case involving the cattle breeding tax shelter scheme, the two-point enhancement was applied to Ziebarth, the defendant who conceived and initiated the scheme, and who brought the other participants, including Jagim, into the deal.

---

4. The court further noted that repetitive, extended conduct may support a finding of more than minimal planning under guidelines provisions applicable to other crimes and that an earlier version of § 2T1.1(b)(2) referred to such provisions. By 1992, this was no longer the case.

5. The Government asserts that this case "most closely resembles" the instant case. Gov't Mem. at 9. I find little or no resemblance. In *Becker,* the taxpayer, a physician, attempted to conceal his very existence by failing to file any tax re-

turns whatsoever and by eliminating all bank accounts in his own name. He used a named entity to bill and collect his fees and opened a numbered account in a warehouse bank in which he deposited those checks. He wrote no checks in his own name; all checks were written on the warehouse bank account or by his son, in their own names. These elaborate efforts at hiding the identity of the taxpayer are quite different than those utilized by defendant Lewis.

The initial idea for E–Z Breeders was Ziebarth's and he willingly participated with Depew in the recruitment of participants ... several of whom were Ziebarth's relatives. There is evidence that Ziebarth received the bulk of the ill-gotten gains from the scam, and that he was slated to receive a share of the profits that was larger than the amount that was to go to others....

*Id.* at 1042. Nothing in this opinion indicates that the enhancement was applied to Jagim, although he was convicted of conspiring with Ziebarth to file false and fraudulent tax returns and of assisting in the filing of such a return.

## C. *Application to Lewis*

■ I find that the Government has failed to prove by a preponderance of the evidence that the two-point enhancement should be applied to Lewis. This is a case "where an individual taxpayer completed his individual 1040 form with false information to avoid paying some of his federal taxes." *Id.; Charroux,* 3 F.3d at 837 (citing *Jagim*). Here, nothing Lewis did was meant to conceal his identity. To the contrary, the checks *he wrote* were intended to be used as proof of *his* expenses. Furthermore, the scheme itself was relatively unsophisticated. While the accounting firm created bank accounts in fictitious names, it was not difficult to determine who opened the accounts, who controlled the accounts, and whose checks were deposited in the accounts. Similarly, the Government has failed to prove that either Lewis or the accounting firm actually *created* any shell corporations, utilized by Lewis, in order to build a paper trail that would shield the nature of the transactions and the identity of those in control of the transactions. While fictitious names were used to open the accounts utilized by Lewis, the absence of a shell corporation used to do business in furtherance of the scheme weighs against appli-

cation of the two-point enhancement for sophisticated means.

■ The Government argues that the scheme is sophisticated because of its length and size. For example, the Government refers to the "vast and complex evasion scheme in which the defendant participated" (Gov't Mem. at 5) and to the eight years in which "Mr. Lewis wrote scores of Escrow Checks, which were negotiated through dozens of Satellite Accounts, in order to fabricate deductions" (Gov't Mem. at 6). While it is true that Lewis wrote 178 checks totalling $154,-839.07 to 26 different payees over eight years, repetitive conduct alone does not mean that he used "sophisticated means" to impede discovery of the nature or extent of the offense.

■ Although Lewis is responsible for the reasonably foreseeable acts of others in furtherance of the jointly undertaken criminal activity, Lewis and the accounting firm are not in the same position. The jointly undertaken criminal activity is that undertaken between Lewis and the accounting firm, not the accounting firm and its other clients. While the accounting firm may have used "sophisticated means" to impede discovery of its overall scheme, Lewis was not involved in that overall scheme.[6] The scheme in which he participated did not involve the "unreported skimming of income from corporations," the "diversion of income to bogus entities," or "conducting 'transactions through corporate shells.'"[7] Gov't Mem. at 5–6.

Lewis' conviction for tax evasion and conspiracy to defraud the IRS is based on a single continuing scheme to evade the full payment of taxes by fraudulently inflating his deductions. In the hierarchy of tax evasion schemes, this one was relatively simple. Lewis wrote checks to fictitious persons and entities to support business expenses or charitable contributions claimed on his tax returns. There is no proof that any of these entities had a bona fide existence. Further-

---

6. *See* note 3, *supra.*

7. Similarly, the Government argues that "[h]ad Mr. Lewis ever been audited, the accounting firm was prepared to use his Escrow Checks as well as invoices that the firm would fabricate in the names of the fictitious payees on the Escrow

Checks to 'justify' deductions, as they had done for many other clients." Gov't Mem. at 4. It is not appropriate to hold Lewis responsible for what the accounting firm *might be prepared to do.* This is mere speculation, not proof.

more, there is no proof that invoices were ever created to support the alleged expenses. The scheme included no mechanism for protecting the identity of the taxpayer or, indeed, the nature of the scheme. For these reasons, I find that the two-point enhancement for use of "sophisticated means" should not apply.