UNITED STATES of America, Appellant,

v.

Ephraim LEWIS, Defendant–Appellee.

No. 1514, Docket 95–1681.

United States Court of Appeals,
Second Circuit.

Argued May 8, 1996.

Decided Aug. 28, 1996.

1076

Lewis J. Liman, Assistant United States Attorney, New York City (Mary Jo White, United States Attorney, Alexandra Rebay, Assistant United States Attorney, Southern District of New York, New York City, of counsel), for Appellant.

Robert G. Morvillo, New York City (Monique Lapointe, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York City, of counsel), for Defendant–Appellee.

Before CARDAMONE, ALTIMARI, and PARKER, Circuit Judges.

CARDAMONE, Circuit Judge:

This appeal by the United States in a criminal sentencing case asks us to determine whether "sophisticated means" were used to impede discovery of a tax-evasion scheme. *See* United States Sentencing Guidelines § 2T1.1(b)(2). This is our first occasion to interpret this provision of the Guidelines.

Courts are frequently asked to interpret broad phrases that defy precise definition. Such phrases are often expressed at a high level of generality, and a "mechanical jurisprudence" will not help define them. "Sophisticated means" is one such open-ended phrase. We are not charged with ascertaining an abstract formulation for it that would allow sentencing cases "[to] be worked out like mathematics from some general axioms." Oliver Wendell Holmes, *The Path of the Law, in The Mind and Faith of Justice Holmes* 71, 79 (Max Lerner ed., 1943). Rather, we need only determine how the words of the Guidelines are to be applied to the facts of a given case. In this inquiry we are guided by the language to be construed, commentary from its author, cases interpreting the language, and an understanding of the interests that the words are designed to further. Because we conclude that the tax-evasion scheme here involved the use of sophisticated means, we vacate the sentence imposed by the district court and remand the case for resentencing.

## BACKGROUND

### A. *Underlying Facts*

Defendant Ephraim Lewis is a former editor of a business magazine and a resident of New York City. Between 1982 and 1993 he employed Abrams Associates, an accounting firm, to prepare his tax returns. Abrams Associates was owned at different times by three coconspirators not charged in Lewis' criminal proceeding. According to an information filed by the government, Lewis and these others conspired to defraud the United States and to evade a substantial part of the income tax defendant owed.

The underlying facts concerning the conspiracy are not disputed. Abrams Associates instructed Lewis to draw checks on his personal bank accounts payable to various individuals and entities, including "YMCA," "Gods Church," "Ken Ferstig," "Ron Consulting," and "Don Shirley," all of which were fictitious. Abrams Associates deposited these checks (Escrow Checks) into bank accounts (Satellite Accounts) opened in the names of the sham entities. The existence of the Satellite Accounts created the false impression that Lewis' payments were made to actual businesses and charities.

Next, Abrams Associates transferred the funds from the Satellite Accounts into a second set of bank accounts (Operational Accounts). Ninety percent of the money in the Operational Accounts was used to pay defendant's creditors including Citibank, American Express, and Saks Fifth Avenue, to make personal investments on his behalf, and to pay his living expenses, *e.g.*, mortgage payments and utility bills. Abrams Associates retained 10 percent of the funds in the Operational Accounts as its fee for facilitating defendant's tax evasion.

Despite the fact that defendant made no actual payments to any businesses that would entitle him to claim a tax deduction and did not make the alleged contributions to charity, he nonetheless claimed $130,000 in deductions between 1984 and 1991. He also wrote Escrow Checks totalling $7,000 in 1992, which were not claimed as deductions only

because the Internal Revenue Service (IRS) discovered the conspiracy before Lewis filed his 1992 tax return. During this eight-year conspiracy, Lewis wrote 178 checks to 26 different fictitious businesses and charities, and he evaded $36,400 in federal personal income taxes. Lewis was not the only individual to profit from this fraudulent arrangement; over a score of others have also been indicted for tax-evasion offenses arising out of this conspiracy, all but five of whom have pled guilty.

## B. *Proceedings Below*

Defendant entered into a written plea agreement on January 18, 1995, in which the government agreed to accept a guilty plea to both counts in the information. Count One charged defendant with participating in a conspiracy to defraud the United States in violation of 18 U.S.C. § 371. Count Two charged that defendant willfully attempted to evade income taxes imposed pursuant to the Internal Revenue Code in violation of 26 U.S.C. § 7201 and 18 U.S.C. § 2.

Both parties agreed to apply the 1992 United States Sentencing Guidelines, *see* United States Sentencing Commission, *Guidelines Manual* (Nov.1992) (U.S.S.G. or Guidelines)—and references to Guidelines provisions hereafter are to the 1992 version, unless another date is specifically indicated— in calculating defendant's sentence, thereby avoiding any *ex post facto* problems and offering leniency to defendant. The plea agreement provided that Lewis' base offense level should be 10 (although the parties disputed whether the $7,000 that Lewis planned to deduct in 1992 should be included in this calculation). It was further agreed that defendant's offense level should be reduced by two levels to recognize his acceptance of responsibility. *See* U.S.S.G. § 3E1.1(a). Lewis' criminal history category was I, as he had not previously been convicted of a crime. The plea agreement specifically provided that the parties entered into no stipulation concerning the question of whether U.S.S.G. § 2T1.1(b)(2) applied. This specific offense characteristic states that "[i]f sophisticated means were used to impede discovery of the nature or extent of the offense," the sentenc-

ing court should increase the defendant's offense level by two levels.

Lewis pled guilty in the United States District Court for the Southern District of New York (Scheindlin, J.) on April 6, 1995. The Probation Department adopted all the stipulations in the plea agreement and determined that the tax loss caused by defendant included the $7,000 in checks written in 1992. It also recommended that § 2T1.1 be applied, observing that the use of fictitious entities made the Abrams tax-evasion plan similar to the use of corporate shells discussed in an application note to § 2T1.1. When the defendant objected to this recommendation, the trial court held a hearing on the enhancement's applicability.

It found that the government did not prove by a preponderance of the evidence that this enhancement should be applied. *United States v. Lewis,* 907 F.Supp. 683, 688 (S.D.N.Y.1995). Noting the difficulty of deciding whether a specific course of conduct can be described as sophisticated, the district court deemed the question "subjective" and "essentially a question of fact." *Id.* at 685. It described a "continuum of increasing sophistication," starting with the failure to report cash income and ending with the creation of phony foreign tax credits, *id.* at 685– 86, and explained that its task was to "draw the line between a scheme that uses 'sophisticated means' and one that does not." *Id.* at 686.

The trial court considered the two examples of sophisticated means provided in the Guidelines commentary—offshore bank accounts and corporate shells—and found both examples involve shielding the taxpayer's identity. Identity concealment, it concluded, was an especially important factor in determining whether sophisticated means were employed. *Id.* at 686–88. Based on this analysis, the district court reasoned that the instant case involved nothing more than " 'an individual taxpayer complet[ing] his individual 1040 form with false information to avoid paying some of his federal taxes.' " *Id.* at 688 (quoting *United States v. Jagim,* 978 F.2d 1032, 1042 (8th Cir.1992), *cert. denied sub nom. Ziebarth v. United States,* 508 U.S. 952, 113 S.Ct. 2447, 124 L.Ed.2d 664

(1993)). Further, it ruled that although fictitious entities were used, no shell corporations actually existed, and that Lewis did not attempt to conceal his identity. Hence, the scheme was unsophisticated. *Id.*

The trial court specifically rejected two other government contentions. With respect to the duration and scale of the conspiracy, it determined that repetitive conduct alone does not show the use of sophisticated means. And, it ruled even if Abrams Associates used sophisticated means, Lewis was not involved in its overall plans but only in a single unsophisticated scheme. *Id.* at 688. On reconsideration, the sentencing court affirmed its decision, reasoning that even if the scheme was sophisticated, defendant did not initiate or create the scheme, and he did not take it to the extremity that the accounting firm did. Its analysis concerning the defendant's relative role in the overall tax avoidance plan relied on the rationale in a connected case it cited, *United States v. Richman,* 95 Cr. 292 (S.D.N.Y.1995) (Leisure, J.).[1] The district court also commented that if it were to apply the sophisticated means adjustment, a minor role adjustment (pursuant to U.S.S.G. § 3B1.2) would then be appropriate because Lewis' role was minor in comparison to the role of Abrams Associates.

Lewis was thereupon sentenced to a term of three years of probation and 300 hours of community service, and ordered to pay all back taxes, interest and penalties, a $2000 fine, and a special assessment of $100. From this judgment, the United States appeals.

## DISCUSSION

### I  Standard of Review

▊ We must determine at the outset the standard by which we review the district court's decision. Defendant contends that because the sophisticated means inquiry is intensely factual, we should review for clear error. He draws our attention to cases from other circuits which have relied on this standard. *See, e.g., United States v. Hunt,* 25 F.3d 1092, 1097–98 (D.C.Cir.1994) (reviewing for clear error); *United States v. Charroux,* 3 F.3d 827, 836 (5th Cir.1993) (same). We have not yet construed the sophisticated means enhancement and therefore have not adopted a standard of review for such cases. But our standard for reviewing the application of other Guidelines provisions is not new: We review the district court's findings of fact for clear error, *United States v. Mafanya,* 24 F.3d 412, 414 (2d Cir.1994), and review its application of the Guidelines to the facts *de novo,* giving due deference to the sentencing court. *See* 18 U.S.C. § 3742(e); *Mafanya,* 24 F.3d at 414; *United States v. Shoulberg,* 895 F.2d 882, 884 (2d Cir.1990). *Cf. Koon v. United States,* —— U.S. ——, ——, 116 S.Ct. 2035, 2047, 135 L.Ed.2d 392 (1996) (acknowledging that the deference that is due depends on the question presented and that a district court abuses its discretion when it makes an error of law).

This standard—*de novo* review with deference to the sentencing court's application—has been employed when reviewing district court interpretations of other Guidelines provisions no less fact-intensive or subjective than the sophisticated means enhancement. *See, e.g., United States v. Palmer,* 68 F.3d 52, 54–55 (2d Cir.1995) ("crime of violence"); *United States v. Gaston,* 68 F.3d 1466, 1468 (2d Cir.1995) (per curiam) ("minimal" or "minor" role); *United States v. Broderson,* 67 F.3d 452, 455 (2d Cir.1995) ("abused a position of public or private trust"); *United States v. Keller,* 58 F.3d 884, 894 (2d Cir. 1995) ("related" robbery convictions); *Mafanya,* 24 F.3d at 414 (obstruction of justice).

**1.** The government's appeal in *Richman* is being heard in tandem with the instant case. We recognize that the Abrams Associates cases have been handled differently by other judges in the Southern District. Four district courts—two of them after the date of sentence in this case—applied the enhancement on facts highly similar to those arising out of the same tax evasion scheme at issue here. *United States v. Korn,* 95 Cr. 297 (S.D.N.Y.1995) (Schwartz, J.); *United States v. Lapin,* 95 Cr. 296/95 Cr. 303 (S.D.N.Y.

1996) (Sprizzo, J.); *United States v. Milici,* 95 Cr. 301 (S.D.N.Y.1995) (Schwartz, J.); *United States v. Bayer,* 95 Cr. 299 (S.D.N.Y.1995) (Wood, J.). In addition to the *Lewis* and *Richman* courts, one court has declined to apply the enhancement to a scheme involving Abrams Associates. *United States v. Sidel,* 95 Cr. 304 (S.D.N.Y.1996) (Kaplan, J.) (taxpayer's employer diverted portion of taxpayer's income to corporate bank account set up by Abrams Associates).

Also, other circuits have adopted formulations similar to this Circuit's. *See United States v. Pierce*, 17 F.3d 146, 151 (6th Cir. 1994) (reviewing *de novo* application of § 2T1.1(b)(2) to facts); *see also United States v. Veksler*, 62 F.3d 544, 550 (3d Cir. 1995) (exercising "plenary review" over legal questions regarding the meaning of § 2T1.1(b)(2)), *cert. denied sub nom. McNaughton v. United States*, — U.S. —, 116 S.Ct. 780, 133 L.Ed.2d 731 (1996); *United States v. Rice*, 52 F.3d 843, 849 (10th Cir.1995) (giving only "due deference" to sentencing court's application of § 2T1.1(b)(2) to facts), *cert. denied*, — U.S. —, 116 S.Ct. 2536, 135 L.Ed.2d 1058 (1996). Hence, we review the decision *de novo*, giving due deference to the district court's Guidelines application.

## II   Guidelines § 2T1.1(b)(2)

### A.   *Review of Language and Commentary*

■ Interpretation of the Guidelines is similar to statutory construction. *See United States v. Kirvan*, 86 F.3d 309, 311 (2d Cir.1996). We begin with the language of U.S.S.G. § 2T1.1, which provides the sentencing rules for tax-evasion offenses. After explaining how the base offense level is calculated, it establishes two enhancements for "Specific Offense Characteristics." The enhancement relevant to this appeal, § 2T1.1(b)(2), states that "[i]f sophisticated means were used to impede discovery of the nature or extent of the offense, increase [the offense level] by 2 levels."

■ The United States Sentencing Commission (Commission), author of the Guidelines, provided commentary explaining this subsection. In analogizing the Guidelines to "legislative rules adopted by federal agencies," the Supreme Court has compared the Commission's commentary "to an agency's interpretation of its own legislative rules." *Stinson v. United States*, 508 U.S. 36, 45, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993). As such, this commentary should be "given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation,'" *id.* (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)), and we must

accord it a significant role in our construction of § 2T1.1. Should the commentary contradict the provision's text, the provision's plain language of course controls.

The commentary to § 2T1.1 states that

"Sophisticated means," as used in § 2T1.1(b)(2), includes conduct that is more complex or demonstrates greater intricacy or planning than a routine tax-evasion case. An enhancement would be applied for example, where the defendant used offshore bank accounts, or transactions through corporate shells.

U.S.S.G. § 2T1.1(b)(2), comment. (n.6). The Commission added that while "tax evasion always involves some planning, unusually sophisticated efforts to conceal the evasion decrease the likelihood of detection and therefore warrant an additional sanction for deterrence purposes." U.S.S.G. § 2T1.1, comment. (backg'd).

The commentary furnishes three principal thoughts. First, the provision targets conduct that is more complex, demonstrates greater intricacy, or demonstrates greater planning than a routine tax-evasion case. This test is disjunctive, that is, the relevant conduct need only satisfy one of these requirements. Second, the 1992 commentary offers two examples of covered conduct—the use of offshore bank accounts or the use of corporate shells. The most current version of this commentary adds a third example, the use of "fictitious entities." *See* United States Sentencing Commission, *Guidelines Manual* § 2T1.1, comment. (n.4) (Nov.1995) (1995 U.S.S.G.). This language was added in a 1993 amendment to the Guidelines. *See* United States Sentencing Commission, *Guidelines Manual* App. C amend. 491, at 328, 333 (Nov.1993). While this amendment does not control the instant case because it was not part of the 1992 Guidelines, it may be considered where it "clarifies and simplifies" the subject at issue and makes no "substantial change" to the Guidelines. *United States v. Hendrickson*, 26 F.3d 321, 330 n. 6 (2d Cir.1994); *see also United States v. Colon*, 961 F.2d 41, 45 (2d Cir.1992) (indicating that clarifying amendments might be relevant).

■ Third, the commentary explains that the section is designed to increase punishment in those cases that, because of their sophistication, might be harder to detect and therefore require additional punishment for heightened deterrence. *See* U.S.S.G. § 2T1.1, comment. (backg'd). The Commission also observed that "[b]ecause of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines." U.S.S.G. ch. 2, pt. T1, intro. comment. These observations make clear that deterrence is the section's animating policy. We construe it with this in mind.

### B. *Jurisprudence From Other Circuits*

Because the definition of sophisticated means is a question of first impression in this Circuit, decisions from other circuits are helpful in understanding what sorts of tax-evasion schemes have elsewhere been deemed sophisticated. In *Jagim*, 978 F.2d at 1042, enhancement was held appropriate for a defendant who helped create a fraudulent tax shelter that involved a partnership formed to breed cattle using embryos from "super cows." *Id.* at 1036. The shelter's beneficiaries profited through the falsification and backdating of documents. *Id.* In affirming the use of the enhancement for that extensively planned scheme, the court recognized that this was "not a case where an individual taxpayer completed his individual 1040 form with false information to avoid paying some of his federal taxes." *Id.* at 1042. Similarly, our case also involves the use of false documentation—in the form of personal checks to fictitious entities.

In *United States v. Clements*, 73 F.3d 1330, 1340 (5th Cir.1996), use of a separate bank account in defendant's wife's name and the conversion of concealed income into multiple cashier's checks was sufficient to justify the enhancement. The defendant received $270,000 in the form of 23 checks and converted these large checks into smaller cashier's checks, sometimes as many as 13 smaller ones, some payable to defendant's creditors and others payable to himself. These smaller checks were then either cashed, placed in his wife's bank account, or converted into additional cashier's checks. *Id.* As in *Clements,* multiple checks and bank accounts were used in the instant case to evade IRS detection. In *United States v. Becker,* 965 F.2d 383, 390 (7th Cir.1992), *cert. denied,* 507 U.S. 971, 113 S.Ct. 1411, 122 L.Ed.2d 783 (1993), enhancement was ruled appropriate for a defendant who used a "so-called warehouse bank" that allowed him to keep his assets in an account identified only by an arbitrary number not readily traceable to defendant. The scheme used in the case at bar is no less complex than those employed in *Jagim, Clements* and *Becker.*

Some cases applying the enhancement appear to have involved a combination of acts, each of which standing alone was not especially complex, but which constituted sophisticated means when considered as a whole. *See, e.g., United States v. Wu,* 81 F.3d 72, 73–74 (7th Cir.1996) (enhancement applicable when defendants falsified business records of closely-held corporation, deposited receipts in bank accounts under other names, used fraudulent documents to maintain offshore accounts, and provided incomplete and false information to accountant); *Pierce,* 17 F.3d at 150 (applying enhancement when defendant presented employer with false information, used several different mailing addresses, changed number of deductions so as not to alert IRS, and directed wife to file misleading returns).

Other cases applying the enhancement concerned tax evasion plans that appear more complex than the instant case. In *Veksler,* 62 F.3d at 547, for example, the defendants used so-called "daisy chains," which are a series of paper transactions made through several companies (including fictitious companies), to avoid paying taxes on a type of oil that is taxed when used as diesel fuel but tax-exempt when used for home heating purposes. *Charroux,* 3 F.3d at 829, involved "land flips," an "elaborate" transaction in which a buyer agrees to purchase land for an inflated price and in turn receives a share of the seller's profits on the sale. *Id.* at 837. *See also Hunt,* 25 F.3d at 1093–94, 1097 ("[N]either the probation officer nor the government nor apparently [defense counsel]

can figure out exactly what he did.") (second alteration in original); *United States v. Hammes,* 3 F.3d 1081, 1082 (7th Cir.1993) ("big-time bookie" who handled more than $23 million in bets in four years and used offshore money-laundering to disguise profits); *United States v. Ford,* 989 F.2d at 347, 349, 351 (9th Cir.1993) (use of foreign corporation to claim foreign tax credit improperly).

Defendant draws our attention to *Rice,* 52 F.3d at 849, and *United States v. Kaufman,* 800 F.Supp. 648, 655 (N.D.Ind.1992), two cases in which the enhancement was not applied. The means employed in both clearly were less sophisticated than those used here. In *Rice,* 52 F.3d at 849, the defendant "merely claimed to have paid withholding taxes he did not pay." And in *Kaufman,* 800 F.Supp. at 655, the defendant simply used a system of dummy deposit slips that effectively served as a second set of books in order to avoid declaring income. *See also United States v. Stokes,* 998 F.2d 279, 282 (5th Cir. 1993) (reversing application of enhancement because simply not disclosing income to an accountant is not sophisticated means). Although none of the above cases is squarely on point, together they shed light on the types of schemes that may be described as using sophisticated means.

### III   Instant Case Requires Enhancement

#### A.   *Sophisticated Means Employed*

■ Having reviewed those cases more complex and those less complex than the scheme before us, we turn to the present case. Lewis wrote nearly 200 checks to nonexistent businesses and charities during an eight-year period. These checks, drawn on his own bank account, were deposited into 26 different bank accounts. The money was transferred from these Satellite Accounts into Operational Accounts and most of the money in the Operational Accounts was used to pay Lewis' personal expenses. Before the IRS uncovered this arrangement, Lewis managed to claim $130,000 in fraudulent deductions.

Even though this tax-evasion scheme cannot be described as singularly or uniquely sophisticated, it is more complex than the routine tax-evasion case in which a taxpayer reports false information on his 1040 form to avoid paying income taxes, *Jagim,* 978 F.2d at 1042, or asserts he paid taxes that he did not pay, *Rice,* 52 F.3d at 849. Here, there was a three-step scenario that used numerous fictitious entities and multiple checks with the sole purpose of evading taxes and avoiding IRS detection. It was crafted by Abrams Associates, an accounting firm with knowledge of the tax code and system, and it was designed to move money through two levels of bank accounts in order to conceal the track the money followed. On reconsideration, the district court acknowledged that the overall plan required the use of sophisticated means.

■ While the use of shell corporations would have strengthened the government's contention that sophisticated means were employed, the district court should not have concluded that its absence weighed against application of the sophisticated means enhancement. *See Lewis,* 907 F.Supp. at 688. There is nothing talismanic about the use of shell corporations. While their absence might mean that the case cannot be disposed of by reference to one of the examples specifically enumerated in the commentary, the examples are by their own terms simply illustrative, not exclusive.

Further, we believe that the use of fictitious entities is sufficiently similar to the use of shell corporations that our decision today is not inconsistent with the examples provided in the commentary. Indeed, in the commentary in the current version of the Guidelines, the use of "fictitious entities" has been added as an example of sophisticated means of tax evasion. 1995 U.S.S.G. § 2T1.1, comment. (n.4). This strengthens our conclusion that this tax-evasion scheme—one that relied heavily on the use of fictitious entities—was sophisticated.

Moreover, this plan was no less complex than those involved in *Jagim,* 978 F.2d at 1042 (using falsification and backdating of documents), *Clements,* 73 F.3d at 1340 (using multiple checks and bank accounts to disguise actual earnings), and *Becker,* 965 F.2d at 390 (using a single warehouse bank account to hide assets). When the district

court held that this case involved little more than the filing of a tax form with incorrect information, *Lewis*, 907 F.Supp. at 688, it understated the complexity of the scheme. Here, because the taxpayer's checks were written to accounts bearing the names of fictitious entities, the transactions created cancelled checks that could be used to avoid detection in the event of an audit—a factor not present in a simple false filing case. Even if each step in the planned tax evasion was simple, when viewed together, the steps comprised a plan more complex than merely filling out a false tax return. *See Wu*, 81 F.3d at 73–74 (looking at scheme as a whole); *Pierce*, 17 F.3d at 151 (same).

■ The evasion strategy also required as much planning as was involved in some of the cases deemed sophisticated, such as *Becker* and *Clements*. While we agree with the district court that repetitive conduct alone does not show that sophisticated means were employed, *Lewis*, 907 F.Supp. at 688, the repetitive conduct here is relevant because it demonstrates that more than routine planning was involved. By writing so many checks to so many different entities, Lewis' actions lent a quality of authenticity and a higher level of intricacy to the plan than if he had only written a few large checks each year to a single entity. In addition, the use of scores of checks and more than two dozen different accounts also demonstrates that more planning was required here than in an ordinary tax-evasion case. In short, we do not believe that because we rule this scheme sophisticated, every defendant who filed a fraudulent tax return will be subject to enhancement. *See Rice*, 52 F.3d at 849 (raising this concern).

■ The district court placed special importance on the fact that Lewis did not mean to conceal his identity. *Lewis*, 907 F.Supp. at 688. It noted that "the checks *he wrote* were intended to be used as proof of *his* expenses." *Id.* Again, we agree with the trial court that identity concealment is a relevant factor in determining whether a scheme used sophisticated means. Naturally, concealment of identity can help make a scheme more complex and more difficult to detect and, as such, often requires additional

planning. However, it is not the *sine qua non* of a sophisticated tax-evasion scheme. While some cases have involved identity concealment, *see, e.g., Becker*, 965 F.2d at 390, others have not, *see, e.g., Ford*, 989 F.2d at 351. Moreover, were we to adopt this heavy emphasis on identity concealment, few false deduction cases could ever be deemed to involve the use of sophisticated means. A taxpayer who claims false deductions must, by necessity, identify himself on his tax return.

■ Nor do we accept the "reasonably competent IRS auditor" standard advanced by defendant. The relevant inquiry is not whether the IRS could have or should have discovered the tax evasion conspiracy. This question is largely hypothetical, because in every case that is prosecuted, the IRS will have uncovered the plan. It is also an inquiry not readily susceptible to proof, since we should not require the IRS to disclose the standards and methods it uses to select tax returns for audit, a matter confided to the authority and discretion of the executive branch. Release of this information would allow parties to structure their tax returns to avoid audits. *See Long v. IRS*, 891 F.2d 222, 224 (9th Cir.1989); 26 U.S.C. § 6103(b)(2). Although a plan must be sophisticated for the enhancement to be applied, it need not be "fail-safe," *Charroux*, 3 F.3d at 837 n. 18, or impossible for the IRS to uncover.

As this tax-evasion scheme was more complex and demonstrated greater intricacy and planning than a routine tax-evasion case, sophisticated means were employed. After according due deference to the sentencing court, we hold that it made an error of law when it ruled otherwise.

### B. *Offense Characteristic*

■ On reconsideration, the district court held that even if the overall scheme operated by Abrams Associates was sophisticated, the court would not apply the enhancement because "it was the accounting firm that had devised the scheme, and although clearly the defendant was a willing participant, the defendant did not initiate or create this scheme." In effect, the district court treated

the "sophisticated means" provision as a characteristic of the individual defendant rather than as an offense characteristic. In other words, it decided that the enhancement is inappropriately applied unless the individual defendant used sophisticated means.

The language of § 2T1.1(b)(2) states that the enhancement is appropriate "[i]f sophisticated means were used to impede discovery ... of the offense." Written in the passive voice, it stands in contrast to § 2T1.1(b)(1), which calls for an enhancement only "[i]f the defendant failed to report or to correctly identify the source of income exceeding $10,-000 in any year from criminal activity." In other words, the latter provision specifically requires that the defendant engage in certain offense-related conduct, while the former only requires the "use[ ]" of sophisticated means in carrying out the offense.

When a Guidelines provision speaks in the passive voice, we generally consider it to refer to "an offense characteristic, not a characteristic of the individual defendant," *United States v. Rosa,* 17 F.3d 1531, 1552 (2d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 211, 130 L.Ed.2d 140 (1994). We have held that § 2B1.1(b)(4), the Guidelines provision that enhances a sentence "[i]f the offense involved more than minimal planning," does not require the defendant's personal involvement in the planning. *Rosa,* 17 F.3d at 1552 (applying then-applicable version of 1995 U.S.S.G. § 2B1.1(b)(4)(A)). Similarly, § 2E2.1(b)(1)(C), which provides an enhancement "if a dangerous weapon (including a firearm) was brandished, displayed or possessed" during the crime, "is satisfied by mere possession of the firearm during the crime, and does not require the particular defendant to have been in possession." *United States v. Lanese,* 890 F.2d 1284, 1292 (2d Cir.1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2207, 109 L.Ed.2d 533 (1990); *see also United States v. Giraldo,* 80 F.3d 667, 677 (2d Cir.1996) (indicating that defendant need not possess weapon for enhancement pursuant to § 2D1.1(b)(1), which provides for enhancement "[i]f a dangerous weapon ... was possessed").

Defendant maintains that the commentary's wording bars this reading. The com-mentary states that "[a]n enhancement would be applied for example, where the defendant used offshore bank accounts." By referring to "the defendant," Lewis contends, the commentary implicitly regards the provision as a characteristic of the individual defendant. However, the commentary merely provides an example of the conduct covered by the provision. It does not foreclose the possibility that the enhancement could be applied in other circumstances, such as when a defendant profits through his participation in a plan devised by another. Also, to the extent that the commentary and the Guidelines language are in tension, the language of § 2T1.1(b)(2) is, of course, controlling. *See Stinson,* 508 U.S. at 45, 113 S.Ct. at 1919.

Moreover, our reading is consistent with the policies underlying the sophisticated means enhancement. That Lewis himself did not personally develop the tax-evasion scheme did not make it any easier for the IRS to detect his illegal conduct. The same policy rationale that supports regarding the enhancement for planning as an offense characteristic—heavily planned crimes merit more severe punishment—also exists here, as more than routine planning is one possible way to show the employment of sophisticated means.

Nor is it in any way unjust for Lewis, who hired the accountants who developed the scheme, to be found equally culpable as a defendant who independently developed a similar scheme. A defendant cannot escape punishment simply by contracting out to his accountants the dirty work of tax evasion. Adopting the defendant's construction would effectively reduce U.S.S.G. § 2T1.1(b)(2) to a mere accountants' liability provision, a result at odds with both the enhancement's language and its purpose.

Justice Holmes explained it in these words: "Taxes are what we pay for civilized society.... A penalty on the other hand is intended altogether to prevent the thing punished." *Compañía General de Tabacos de Filipinas v. Collector of Internal Revenue,* 275 U.S. 87, 100, 48 S.Ct. 100, 105, 72 L.Ed. 177 (1927) (Holmes, J., dissenting). Defendant's failure to recognize the implicit command in the first half of this proposition now

ineluctably leads to imposition of a penalty of the sort described in the second half. Consequently, the sophisticated means enhancement applies in the case at hand even though defendant neither devised nor created the criminal scheme in which he participated and from which he benefitted.

### IV   No Minor Role Adjustment

On reconsideration, the district court stated that even if the court "did apply the sophisticated means adjustment, then [it] would have been inclined to cancel it out with the finding of minor role, because [it] would then be required to compare the role [of] the client to the role of the accounting firm." Whether this was an off-hand suggestion or an alternative holding, we note that no minor role adjustment would be appropriate here.

Abrams Associates, as discussed earlier, orchestrated a tax-evasion conspiracy with more than 20 participants. Lewis was only charged with participating in a small part of this conspiracy—his claiming of some $130,-000 in false deductions. In other words, his base offense level was calculated on the basis of his limited role and not his role in the entire Abrams Associates conspiracy. A minor role reduction pursuant to U.S.S.G. § 3B1.2(b) is therefore inappropriate. *See United States v. Gomez,* 31 F.3d 28, 31 (2d Cir.1993). Lewis cannot be described as a "minor participant" in the conspiracy that existed only between himself and Abrams Associates. Accordingly, to the extent that this was an alternative holding, it was erroneous.

### CONCLUSION

For the reasons stated, we vacate the sentence and remand this case to the district court for resentencing.