108 F.3d 1370
 NOTICE: THIS SUMMARY ORDER MAY NOT BE CITED AS PRECEDENTIAL AUTHORITY, BUT MAY BE CALLED TO THE ATTENTION OF THE COURT IN A SUBSEQUENT STAGE OF THIS CASE, IN A RELATED CASE, OR IN ANY CASE FOR PURPOSES OF COLLATERAL ESTOPPEL OR RES JUDICATA. SEE SECOND CIRCUIT RULE 0.23.
UNITED STATES of America, Appellee,
v.
James HARTE, Defendant-Appellant.
 No. 96-1526.
 United States Court of Appeals, Second Circuit.
 March 21, 1997.
 
 APPEARING FOR DEFENDANT-APPELLANT: NATHAN Z. DERSHOWITZ, Dershowitz & Eiger, P.C. (Amy Adelson, on the brief), New York, NY.
 APPEARING FOR APPELLEE: WILLIAM GURIN, Assistant United States Attorney (Zachary W. Carter, United States Attorney for the Eastern District of New York; David C. James, on the brief), Brooklyn, NY.
 JACOBS, LEVAL and CABRANES, Circuit Judges.
 
 
 1
 This cause came on to be heard on the transcript of record from the United States District Court for the Eastern District of New York, and was argued by counsel.
 
 
 2
 ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the judgment of the district court is AFFIRMED.
 
 
 3
 Following a jury trial in the District Court for the Eastern District of New York (Carman, J.), James Harte was convicted of five counts of perjury before a grand jury, in violation of 18 U.S.C. § 1623(a); and one count of obstruction of justice, in violation of 18 U.S.C. § 1503. He was sentenced to concurrent terms of imprisonment of eighteen months on each count, and to a fine equal to the cost of his incarceration and supervised release.
 
 
 4
 On appeal, Harte argues that: 1) the government failed to disclose that his indictment was based on an inaccurate telephone record and relied on a materially different telephone record in its summation without notice to Harte, thus depriving him of a fair trial; 2) the government's rebuttal summation misrepresented evidence to the jury and improperly shifted the burden of proof to Harte; 3) the district court erroneously found that Harte's perjury before the grand jury warranted a three-level enhancement for interference with the administration of justice; and 4) the district court erroneously fined Harte the cost of his incarceration and supervised release, and calculated that cost incorrectly.
 
 I.Background
 
 5
 In 1994, as part of an investigation into a series of arsons, insurance frauds, and bank frauds, a grand jury examined the circumstances underlying a 1991 bank loan for $100,000 issued by Richmond County Savings Bank to James Harte. The bank had believed that the loan was applied for by and issued to James Harte, and that the loan was secured by two properties owned by Harte. In fact, however, Gerald Fine had impersonated Harte, applied for the loan, and received the proceeds.
 
 
 6
 To ascertain how Fine was able to impersonate Harte and obtain the loan, the grand jury called Harte to testify regarding any knowledge of Fine or the loan. Before Harte testified, a special agent from the Bureau of Alcohol, Tobacco and Firearms confronted him with telephone records reflecting that over sixty telephone calls from Fine's number to Harte's had been made during the year before the fraudulent loan. Harte told the agent that he did not know Fine and that he had no idea why Fine had called him. He also said that he had received a lot of hang-ups over that period of time.
 
 
 7
 On December 7, 1994, Harte testified before the grand jury that he did not know Gerald Fine, that he had no information about the loan, and that he never gave anyone authority or permission to enter into a loan with Richmond County bank on his behalf.
 
 
 8
 The grand jury indicted three people, including Fine, for their involvement in seven arsons and related frauds on banks and insurance companies. Fine was indicted for, inter alia, his impersonation of Harte in connection with the Richmond bank fraud. Fine and another of the accused, Antonio Safonte, pleaded guilty to arson and conspiracy to commit arson and entered into cooperation agreements with the government.
 
 
 9
 Pursuant to his agreement, Fine told the government (and later a second grand jury), inter alia, what he knew about the Richmond bank loan. Fine testified that the fraud had been successful because Harte had been a knowing participant and had given Fine the necessary information to convince the bank that Fine was Harte. Fine was to get the proceeds of the loan and vanish; Harte would then deny any knowledge of the transaction, and the bank would assume the full loss of the loan. Fine testified about his own role in the fraud, as well as the roles of Harte, Safonte, Michael Cona, and Ted Smolkin. Other evidence put before the grand jury included subpoenaed telephone records showing numerous telephone calls from Fine's number to Harte's throughout the time leading to the Richmond loan, from March 1990 through March 1991.
 
 
 10
 On January 18, 1996, the second grand jury indicted Harte for perjury and obstruction of evidence committed before the first grand jury.
 
 
 11
 At trial, Harte's defense centered on the idea that Harte was an innocent victim of the scam: Fine was able to get financial information from Harte because Fine was helping Harte get a mortgage for Harte's daughter. This was the reason for the numerous telephone calls. The defense also presented a neuropsychologist, who testified that Harte suffered from Attention Deficit Disorder, which prevented him from making the connection between the "Jerry" he had dealt with regarding the mortgage and the "Gerald Fine" about whom he had denied knowledge during the first grand jury proceeding.
 
 
 12
 The jury convicted Harte of each count of the indictment.
 
 II.Discussion
 A.The Telephone Records
 
 13
 Harte argues (i) that the district court should have granted his motion for a new trial, because the government failed to disclose that the indictment was based on an inaccurate telephone record, and then relied on a materially different phone record during summation to demonstrate Harte's complicity in the bank fraud; and (ii) that the use of the inaccurate phone record at the first grand jury proceeding violated his Sixth Amendment right to be informed of the nature and cause of the accusation. Both arguments fail.
 
 
 14
 (i) During Harte's testimony before the first grand jury, he was shown a document purported to be a complete list of telephone calls from Fine's home to his, the "Combined Toll Report." The report indicated that nearly all of the calls had taken place in 1990, and that all of the calls took place before March 2, 1991. Harte was not questioned about any phone calls taking place between March 2 and June 5, 1991, the period immediately preceding the bank closing.
 
 
 15
 While the government was preparing a chart of the telephone calls for trial, it became apparent that the Combined Toll Report contained errors. Over a month before trial began, the government showed its chart--which corrected the errors--to Harte's lawyer, who asked for and received a photocopy.
 
 
 16
 The chart disclosed a number of calls between Fine and Harte after March 1, 1991. The erroneous report was not used at trial or introduced as an exhibit; instead, the chart and the underlying NYNEX telephone records were admitted-- without objection. (The district court gave Harte the opportunity to review the records when they were introduced; the defense reviewed the exhibit and raised no objection.) Twice, during discovery and again just before trial, the government provided the defense with copies of the NYNEX records. (Harte now argues that the copies were illegible, but raised no such complaint at the time.)
 
 
 17
 During its summation, the government showed the chart to the jury and emphasized the increasing frequency of the phone calls between April and June of 1991, directly prior to the bank closing in June 1991:
 
 
 18
 [T]here is a pattern of telephone calls that start to increase as you get into April of 1991, May of 1991 and June of 1991. Why do you think those phone calls are increasing at that time, ladies and gentlemen? I suggest to you that the evidence is clear why they are increasing. This is the period of time when the Richmond County fraud is afoot.
 
 
 19
 Harte argues that this was the first time that the government stressed the timing, rather than the frequency, of the phone calls, and that the government "sat on" the information until the summation.
 
 
 20
 The district court properly denied Harte's motion for a new trial on this ground. We review the denial of a motion for a new trial for abuse of discretion. United States v. Wong, 78 F.3d 73, 78 (2d Cir.1996). Harte charges that the government withheld crucial evidence from the defense. On the contrary, the government promptly provided the defense with all relevant evidence and exhibits. Any failure by Harte's lawyers to examine the materials closely or to recognize the possible inferences from those materials does not warrant a new trial.
 
 
 21
 (ii) Harte also contends that the use of the (imperfect) Combined Toll Summary at the first Grand Jury proceeding violated his Sixth Amendment right to be informed of the nature and cause of the accusation, because the summary did not include any telephone calls after March 2, 1991. This argument bears only on Count Two of the Indictment; the other counts did not deal with the telephone calls.[1]
 
 
 22
 Count Two of the indictment charged Harte with perjuriously denying before the grand jury that he had spoken with Gerald Fine, citing Harte's testimony regarding the telephone calls. The indictment then charged that the testimony was "false in that Harte knew that he had spoken with Gerald Fine over the telephone during the period commencing from on or about March 7, 1990, and continuing until on or about March 1, 1991." The district court found that there was a "substantial similarity" between the dates alleged in the indictment and the dates proffered at trial. We agree. See United States v. Nersesian, 824 F.2d 1294, 1323 (2d Cir.1987) ("Where 'on or about' language is used, the government is not required to prove the exact date, if a date reasonably n ear is established.").
 
 B.The Rebuttal Summation
 
 23
 Harte argues that, during the rebuttal summation, the government deliberately misled the jury about the evidence, and shifted the burden of proof to the defendant. He contends that the district court erroneously denied his motion for a new trial on this ground.
 
 
 24
 Fine testified at trial that he obtained a corporate book and metal corporate seal from Harte's personal attorney, Melvyn Schwartz, and used them at the June 5 closing. The government then argued that the book and seal Fine got from Schwartz were the corporate kit for one of Harte's corporations, and that Fine's possession and use of the kit at the closing proved that Fine and Harte were acting in concert.
 
 
 25
 Schwartz testified for the defense, and claimed that he had continuous possession of the kit from 1987, and that he had never seen a metal seal for the corporate kit in question. During closing, the defense read a notice from the stationer who apparently made the corporate kit: "[w]e have tried to streamline our corporate kits by devising a new computer generated seal [a "wafer" seal] to replace the cumbersome metal seal we provided formerly." The defense then noted that the loan closing documents reflected that a metal seal had been used at the 1991 closing, not a wafer seal; therefore, argued the defense, Fine must have purchased a new metal seal for the closing, and had not obtained it from Schwartz.
 
 
 26
 In the government's rebuttal summation, the government argued that 1) the defense was incorrect that metal seals were phased out and replaced by wafer seals as early as 1987, and 2) the corporate kit introduced by the defense (which contained a wafer seal) was not the kit originally issued in 1987. The government claimed that there was no evidence of Schwartz's use of the wafer seal that would support his testimony that the kit--including a wafer seal--had been in his possession since 1987. Regarding Schwartz's testimony, the government stated:
 
 
 27
 He spoke about the uninterrupted possession of the corporate seal, spoke about playing hardball. At no point, ladies and gentlemen, did Mr. Schwartz address the fact that wafers were being used in 1987, 1988, 1989, 1990, 1991. He didn't because they weren't being used, because ... metal seal[§ were] used for [Harte's two corporations].
 
 
 28
 Harte argues that the government thus misrepresented the evidence by stating that wafer seals were not in existence. We agree with the district court that the challenged passage was simply drawing inferences from Schwartz's testimony. The government is "entitled to broad latitude in the inferences [it] may suggest to the jury during closing arguments, provided [it does] not misstate the evidence, refer to facts not in evidence, or express counsel's personal belief as to guilt or innocence." United States v. Smith, 778 F.2d 925, 929 (2d Cir.1985) (quotes and citation omitted). The government properly characterized Schwartz's testimony that he had the kit--with its alleged wafer seals--the entire time, but noted that Schwartz had not shown any document in which a wafer seal was actually used. This was well within the proper scope of closing argument.
 
 
 29
 Harte also claims that the government improperly shifted the burden to the defense. In reference to Schwartz's testimony regarding the corporate seals, the government argued on rebuttal:
 
 
 30
 There [were] wafers, wafers were used in 1987, '88, and '89, okay, give us the file document. Mr. Schwartz, produce[ ] a document that was filed in which the wafer was used. You've got the [corporate] book, you've used the book. He told you that the book was used in terms of providing it to Mr. Harte on occasion. Get the document. You want to prove that the wafers were in use before 1991, the closing of the Richmond County Bank, get the document. You of all people know where they are, you, of all people, know what has been filed.
 
 
 31
 Harte argues that this was unfair comment on Schwartz's testimony, because there was no basis for believing that Schwartz ever possessed a pre-1991 corporate document bearing a seal, much less that he possessed one at the time of trial. We disagree. Although the government always retains the burden of proving its case beyond a reasonable doubt, see In re Winship, 397 U.S. 358 (1970), the government may comment on the defense's failure to support its own factual theories with evidence, see United States v. Gotchis, 803 F.2d 74, 80-81 (2d Cir.1986). Moreover, the government is allowed to observe that defense counsel failed to examine its own witness fully about the areas of which one would expect the witness to have knowledge. See United States v. Rivera, 971 F.2d 876, 884 (2d Cir.1992).
 
 
 32
 The district court fully instructed the jury as to the applicable burden of proof. Because the government's argument did not shift that burden, there was no reason to give a curative instruction. The district court properly denied the motion for a new trial on this ground.
 
 C.Sentencing Issues
 
 33
 1. Three-Level Enhancement. At sentencing, the district court increased the offense level for Counts One through Five by three levels, pursuant to U.S.S.G. § 2J1.3(b)(2), because Harte's perjury "led to a premature and improper termination of an existing Grand Jury proceeding, especially in regard to the other participants [in the fraud] which resulted in substantial expense to the government." For the same reason, the district court increased by three the offense level for Count Six, because Harte's perjury "interfered with the administration of justice" within the meaning of U.S.S.G. § 2J1.2(b)(2). Harte argues that the government presented no evidence that his testimony had any impact on any investigation of Smolkin or Cona.[2]
 
 
 34
 We review application and interpretation of the Guidelines de novo, giving due deference to the sentencing court, but we do not disturb the district court's findings of fact unless they are clearly erroneous. United States v. Lewis, 93 F.3d 1075, 1079 (2d Cir.1996).
 
 
 35
 We find that a preponderance of evidence supports the government's position. See United States v. Gigante, 94 F.3d 53, 56 (2d Cir.1996). The district court expressly found that Harte's perjury led to a "premature and improper termination" of the first grand jury proceeding, "especially in regard to the other participants ..." (emphasis added). As the government argued at sentencing, without Harte's testimony, there was insufficient evidence to return an indictment against Smolkin or Cona. See United States v. Jones, 900 F.2d 512, 522 (2d Cir.1990) ("[W]hen the defendant has concealed evidence and is the only known source of information, substantial interference with the administration of justice may be inferred."). Although the evidence in support of the government's position is not overwhelming, we find that it supports the enhancement by a preponderance.
 
 
 36
 Harte also contends that, even if the government was correct that Harte was involved in the fraud, he would have invoked his Fifth Amendment right to remain silent rather than testifying about Smolkin or Cona. This argument is meritless. If Harte had invoked his rights under the Fifth Amendment, he would have had a claim to privilege. Perjury entitles one to no such privilege.
 
 
 37
 2. Costs of incarceration and supervised release. Harte argues that U.S.S.G. § 5E1.2(i), authorizing a district court to impose fines to cover the costs of imprisonment and supervised release, is unconstitutional. This Circuit has previously upheld § 5E1.2(i), and we decline to revisit the issue. See United States v. Sellers, 42 F.3d 116 (2d Cir.1994).
 
 
 38
 Harte also contends that the district court improperly sentenced him to a fine reflecting the cost of the entire 18 months incarceration, without taking into account the potential for "satisfactory behavior" reductions in time served. The district court properly calculated the fine based on the sentence, rather than on a prediction as to Harte's future behavior. See U.S.S.G. § 5E1.2(i) ("[T]he court shall impose an additional fine amount that is at least sufficient to pay the costs to the government of any imprisonment, probation, or supervised release ordered.) (emphasis added).
 
 
 39
 We have examined all of Harte's contentions, and find them to be without merit. The judgment of the district court is therefore AFFIRMED.
 
 
 
 [1]
 Count One charged Harte with perjury as to his knowing Fine, Count Three charged "perjury as to the means by which information was obtained," Count Four charged perjury as to knowledge of the Richmond County loan, Count Five charged perjury as to providing permission and authority, and Count Six charged obstruction of justice
 
 
 [2]
 The government has not argued that the enhancement was justified because of any effect on the investigation of Fine, but rather of other individuals involved in the fraud